**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| MIGUEL CRUZ, DAVID MANN, and JEFF WATERS | |
| Plaintiffs, | Case No. 1:25-cv-2990 |
| v. | **JURY TRIAL DEMANDED** |
| YOUTH JUICE, LTD., an Illinois limited company, WELCOME TO YOUTH, LTD., an Illinois limited company, and JESSICA SCOTT, individually, | |
| Defendants. | |

## COMPLAINT

Plaintiffs, Miguel Cruz ("Cruz"), David Mann ("Mann"), and Jeff Waters ("Waters") (collectively, "Plaintiffs"), by their attorneys, Pedersen & Houpt, for their Complaint against Defendants Youth Juice, Ltd. ("Youth Juice"), an Illinois limited company, Welcome to Youth, Ltd. ("Welcome to Youth"), an Illinois limited company, and Jessica Scott ("Scott") (collectively, "Defendants"), state as follows:

## INTRODUCTION

1. This is an action for civil violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961-1968, common law fraud, conversion, and unjust enrichment. Defendants engaged in a fraudulent scheme whereby they solicited investments from Plaintiffs under false pretenses, falsely promising that Plaintiffs would receive equity in Welcome to Youth in exchange for their funds. Between April 2024 and November 2024, Defendant Scott exchanged thousands of emails and text messages with Plaintiffs whereby Scott would reassure Plaintiffs that they were co-owners in the business Welcome to Youth.

2.      After receiving over $210,000 of Plaintiffs' funds via wire transfers, checks, and credit card transactions, Defendants ceased all communications and failed to provide the promised equity or return Plaintiffs' investments.

3.      Plaintiffs became aware that Scott had executed this very same scheme in 2023, operating under the name Youth Juice instead of Welcome to Youth. She offered other investors equity in Youth Juice, stole funds from these investors, and categorized these investments as loans when approaching Plaintiffs to invest in Welcome to Youth.

4.      In essence Defendant Scott is running a Ponzi scheme to defraud potential investors out of significant funds.

5.      Given this pattern of fraud, Plaintiffs firmly believe Defendant Scott will continue her scheme of holding her company out as one entity, approaching investors to obtain funds in said entity, then change the name of her company and begin the process over again.

6.      Plaintiffs bring this action to recover their damages and seek treble damages, attorneys' fees, and all other relief available under RICO and Illinois law.

**<u>PARTIES</u>**

7.      Plaintiff Jeff Waters, an individual, is a citizen of Illinois and resides in Hinsdale, Illinois.

8.      Plaintiff David Mann, an individual, is a citizen of Illinois and resides in Wheaton, Illinois.

9.      Plaintiff Miguel Cruz, an individual, is a citizen of Illinois and resides in Park Ridge, Illinois.

2

10.     Defendant Jessica Scott, an individual, is a citizen of Illinois and resides at 1992 Golden Gate Lane, Naperville, Illinois 60563. Scott serves as the Chief Executive Officer of Youth Juice, Ltd. and Welcome to Youth, Ltd.

11.     Defendant Youth Juice, Ltd. ("Youth Juice") is a limited company organized under the laws of the state of Illinois with a principal place of business located at 17007 Prime Boulevard Lockport, Illinois 60441. Scott is the sole owner of Youth Juice and is listed as its President and Director.

12.     Defendant Welcome to Youth, Ltd. ("Welcome to Youth") is a limited company organized under the laws of the state of Illinois with a principal place of business located at 1992 Golden Gate Lane, Naperville, Illinois 60563 and a production facility located at 3930 Ventura Boulevard, Arlington Heights, Illinois 60004. Scott is the President of Welcome to Youth. As of February 7, 2025, an individual named Marcie Meyer is listed as Welcome to Youth's Director.

## JURISDICTION AND VENUE

13.     This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1367 because Plaintiffs assert claims arising under federal law, and Plaintiffs' remaining state law claims are so related to Plaintiff's federal claim that they form part of the same case or controversy.

14.     Venue is proper in the Northern District of Illinois under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claims alleged herein occurred in this District.

## FACTUAL ALLEGATIONS COMMON TO ALL COUNTS

15.     Youth Juice and Welcome to Youth are a health and wellness beverage brand. It sells cold-pressed fruit and vegetable juice. Scott started operating under Youth Juice in 2023. Scott

ships her cold-pressed juices across the country and services physical locations in Wisconsin and Indiana.

16.     Mann was first introduced to Scott on or around April 13, 2024. Scott was seeking angel investors in her company Welcome to Youth. Mann was intrigued by Scott's story and believed in her product. Mann agreed to assist Scott in getting her company up and running by introducing Scott to investors and potential clients.

17.     On June 21, 2024, Mann wrote a check to Scott for $5,000 as an initial investment in Welcome to Youth after Scott expressed that the company was in jeopardy of closing due to unpaid bills.

18.     Waters was first introduced to Scott on or around July 1, 2024. On July 3, 2024, Waters and Scott exchanged text messages regarding Waters potential investment in Welcome to Youth.

19.     On July 6, 2024, Scott charged $5,528.84 Mann's credit card to pay for bottles.

20.     On July 7, 2024, Scott and Waters met in person to discuss an investment plan for Welcome to Youth and bringing in additional investors. After the meeting, Scott expressed her appreciation for Waters' assistance and stated that she looked forward to working with him as an investor.

21.     Waters believed he could assist Scott in an advisory role on how to stabilize the business to handle growth in the short term. Waters offered to analyze her expenses and revenue streams to help maximize capital efficiency to meet short- and long-term goals. Scott stated agreed and believed Waters was an amazing fit to guide and structure her company. Despite Waters' offer to review her company's book, Scott never allowed Waters to review the financial status of either Youth Juice or Welcome to Youth.

22.     Waters agreed to invest $15,000 in Welcome to Youth. Between July 9, 2024, and July 12, 2024, Waters paid Scott and Welcome to Youth $15,000 via Intuit QuickBooks.

23.     On July 20, 2024, Scott corresponded with Waters that she needed bottles immediately, but she could not pay for them. She sent Waters her account information in order for him to pay for the bottles, On July 22, 2024, Waters paid $12,770.77 for bottles from Taizhou Lanwei Packaging Technology Company on behalf Youth Juice as what was represented to be a partial investment in the Defendant company.

24.     On July 23, 2024, Scott again expressed the need for additional funds to Waters. Scott complained that her landlord was attempting to change her rent at her production facility in Lockport, Illinois. Waters offers to get Scott and her company set up with a small business loan. Scott instead chose to continue asking for funding from Mann and Waters.

25.     On July 26, 2024, Scott forwarded Waters an email from her produce distributor. Scott's distributor was set to halt services on August 9 for her failure to pay past due invoices. Waters offered his assistance and suggested that they work on gaining interest from other investors.

26.     On July 29, 2024, Scott had her accountant, Ahmad Shaqildi, send Plaintiffs a Welcome to Youth Investor Summary for July 2024 using data that Scott herself created. Waters had asked for this information in order to assist Scott in approaching other investors.

27.     On July 30, 2024, Scott hosted a telephone conference with Waters, Mann, Cruz, and two other individuals to seek out investment in Welcome to Youth. Scott stated that the spirit of the call was to raise capital and to strategize with her supporters on the best way to do that. Scott expressed that she needed $25,000 immediately to cover past due expenses and offered Waters, Mann, and Cruz a 25% stake in Welcome to Youth for $150,000 with an option to increase the investment to $200,000 for 30% of the company.

28.     Plaintiffs and Scott orally agreed to the deal and Scott asked for money to be deposited immediately.

29.     Following the call, Scott requested that Waters send the investors the total amount each agreed to invest in her business. Scott requested that all checks be made payable to Welcome to Youth. Scott further requested that for the investors who agreed to invest $10,000 into Welcome to Youth, they split the payments into $5,000 increments to ensure the funds were immediately available to her.

30.     On July 31, 2024, Cruz wrote two checks to Welcome to Youth, each for $5,416.50, totaling $10,833.00. The checks were cashed by Scott on July 31 and August 1, 2024. Cruz specified that the checks were an "investment."

31.     On August 8, 2024, Scott held a telephone conference with Plaintiffs to discuss the need for additional financing to again pay past due invoices. That same day, Cruz wrote a check to Welcome to Youth for $4,000 that was cashed by Scott that day. Cruz specified that the check was an "investment."

32.     On August 9, 2024, Scott called Waters and stated Welcome to Youth needed to move out of its Lockport production facility due to an argument between Scott and her landlord. Scott expressed that she would need to move in 60 days and needed additional funding to do so.

33.     On August 12, 2024, Scott and Waters met in person and held a telephone conference regarding the need for more funding from Plaintiffs. Scott stated that Waters was her "money guy" and that he needed to push Mann and Cruz to send her additional funds. Waters requested Scott send the investors a profits and loss report with projections for future sales in order to make the investors comfortable sending more money to Scott.

34. Om August 16, 2024, Plaintiffs expressed that they were each fully committed to supporting Welcome to Youth as advisors and as investors, and that they understood the immediate need for capital. As of that date, Plaintiffs had contributed approximately $56,000 to Welcome to Youth.

35. However, Plaintiffs expressed to Scott that they needed to conduct their due diligence into the Company and requested that Scott's accountant forward them financial information. Specifically, a report on uncollected sales, a detailed summary of all of Scott's past-due liabilities, as projection of monthly production costs, and detailed reports of past months profits and losses.

36. Additionally, Plaintiffs requested that Scott provide documents to support that no other parties can make claims to the business.

37. Scott responded that her accountant could not answer any of Plaintiffs' questions because Scott was solely responsible for keeping track of uncollected sales, outstanding debts, and operating costs. Scott stated that she would make spreadsheets to send to the investors based on her numbers and that she did not have any of the requested information readily available.

38. On August 17, 2024, Waters communicated with Scott via text message and asked for a status update on the investors' questions. Waters stated that he wanted to get their agreement finalized in a Letter of Intent. Scott agreed and stated she would send the investors an email with a detailed response to their issues shortly.

39. On August 18, 2024, Scott sent Plaintiffs an email in response to their due diligence questions. Scott again reminded Plaintiffs of her need for immediate cash that week.

40.     Regarding other investors, Scott explained that James Weiss contributed to "Youth Juice" not "Welcome to Youth" and that an agreement between the two was not formulated prior to his incarceration for bribery on October 11, 2023.

41.     Scott also stated that an individual named Ken Johnson had given her a "personal loan" to assist her with funding, making clear he had no claim to the company. Scott categorized Mr. Johnson as "medically compromised."

42.     Following Scott's email, Mann and Scott held a telephone conference in order for Mann to draft an agreement regarding Plaintiffs' equity in Welcome to Youth.

43.     Waters, in response to Scott's need for immediate cash flow, directed Scott to Growth Corp, a not-for-profit organization empowered by the U.S. Small Business Administration. Waters hoped to assist Scott secure a small business loan. However, Scott never finalized an application and instead sought to rely on Plaintiffs funds.

44.     On August 21, 2024, Scott, in response to Plaintiffs request to finalize their equity agreement in writing, texted the Plaintiffs that her distribution would be cut off unless she received another $4,200 immediately.

45.     Waters responded to Scott by presenting investment and equity bands of $150,000 for 25%, $200,000 for 30%, and $250,000 for 33%. Scott texted "Yes I'm in." Waters summarized the terms of the agreement in an email to Scott, Mann and Cruz. That evening, Scott called Waters and again expressed her agreement to the proposed terms.

46.     On August 22, 2024, Scott expressed her appreciation to Plaintiffs and her excitement in ironing out the terms of the parties Letter of Intent. Scott then requested additional funding from Plaintiffs and stated that she needed it that day in order to pay her landlord and ensure

there were no interruptions in production. She asked Plaintiffs to coordinate with her on where she can pick up funds.

47. On August 22, 2024, Scott received checks from both Cruz and Mann. Cruz issued a check to Welcome to Youth for $5,000 that was cashed by Scott that day. Cruz specified that the check was an "investment." Mann wrote a check to Scott for an additional $5,000 investment.

48. On August 28, 2024, Scott bought bottles with Mann's credit card for $1,142.50.

49. On August 28, 2024, Scott engaged with a real estate broker in order to find a new production facility for Welcome to Youth. The broker highlighted that they would need to review financials and that there may be an issue with her lack of funds.

50. August 29, 2024, Scott forwards an email to Waters from her distributor. She was again past due on her payments and owed $5,132.50.

51. On August 30, 2024, Scott held an investor call with Plaintiffs. As of this date, Waters had invested approximately $28,000, Cruz had invested approximately $18,000, and Mann had invested approximately $14,000. Waters relayed to the parties that everyone needs to sign the letter of intent. Waters highlighted that the letter of intent needed to be executed but the operating account needed capital as Scott was behind on bills.

52. Scott needed an additional $10,000 to keep the business running while having $12,000 in the Welcome to Youth account. She needed to pay $5,000 for rent plus an additional $2,400 was due to her landlord, $4,500 was owed in production costs, $1,300 for vehicle wrapping fees, $2,500 in bottle fees, $500 for her accountant, $450 in web designer fees, and she needed to pay staff $1,500. Scott stated that she was picking and choosing who she was paying, and that Plaintiffs needed to figure out a way to move more money.

53.     Scott requested that Mann pay what he could with his credit card because the accountant, labels, and wrapping could be paid with credit card via Intuit QuickBooks.

54.     On August 30, 2024, Scott utilized Mann's credit card to pay various expenses totaling $3081.45.

55.     On September 1, 2024, Scott corresponded with Waters via text message and asked about the status of the letter of intent. Scott stated that she paid what bills she could with Mann's credit card but expressed her concern about funding that coming week. Waters expressed that an attorney was in the process of drafting the letter of intent and that he had forwarded the attorney the terms they agreed upon on August 21. Scott again stated she needed money immediately and wanted Waters to ask Cruz to send her additional funds. Scott stated that she was frustrated with Cruz for not getting her money in a timely fashion.

56.     On September 2, 2024, Cruz wrote two checks to Welcome to Youth for $4,167 and $4,000 that were cashed by Scott on September 3, 2024.

57.     On September 6, 2024, Scott corresponded with Plaintiffs via text message. Scott stated that there were exciting updates on the sales front and assured Plaintiffs that the business was heading in the right direction. However, she did not have enough money to purchase a juicer that she needed right away to fulfill the new customer's orders. She wanted to keep a cushion of $5,000 in the business account and there were currently eleven outstanding produce checks that have not cleared. She had to write the produce supplier another $2000 check for apples that day. With this additional purchase of apples and the past due balances, she needed $6,000 to cover the costs of labor and produce that day.

58.     On September 7, 2024, Scott utilized Mann's credit card to purchase a $581.00 juicer on Amazon.

59.     On September 8, 2024, Scott charged $1,892.43 to Mann's credit card for expenses at Home Depot and Big Stickers and Sign.

60.     On September 9, 2024, Scott charged $1,770.93 to Mann's credit card at Home Depot for a juicer.

61.     On September 9, 2024, Scott provided an update to Plaintiffs regarding the new production facility for Welcome to Youth. She told Plaintiffs that they will be expected to put down a security deposit. Additionally, Scott texted Waters privately and stated the investors should consider purchasing the new production facility. Waters responded that they would not.

62.     On September 11, 2024, Waters corresponded to Scott regarding the August Profits and Loss report she sent the Plaintiffs. Waters believed it was incorrect and that clearly the company drove a profit of more than what Scott alleged as many of the expenses set forth in the report were past due from before August and as far back as May. Waters asked Scott to please calculate the actual profit. Waters also discovered that Scott was not accurately keeping track of Plaintiffs investment and was off by approximately $10,000.

63.     On September 14, 2024, Mann paid an additional $90.42 for a juicer.

64.     On September 17, 2024, Scott and Waters review the terms of the Letter of Intent. Scott stated the terms were $150,000 for 25%, $200,000 for 30%, and $250,000 for 33%. Scott selected the $200,000 for 30% but stressed that she needed money now. Waters stated he would send the agreement around to the parties and hoped it would be executed that week. At that point Plaintiffs could fully fund up to $200,000 to help secure a line of credit.

65.     Scott responded to Waters message that she again needed more money and quickly. Scott stated that her produce supplier cashed all the checks from over the weekend, leaving only

$100 in the account. Scott instructed Waters to deposit the money in a Bank of America account under the Welcome to Youth business.

66.     However, Scott recalled that Zelle only allows up to $5,000 a day of deposits. Scott then mentions a second account under Youth Juice, Ltd. This is the first time she stated she was operating under two separate accounts. Scott explained that Youth Juice has an account with U.S. Bank and Welcome to Youth has an account with Bank of America.

67.     On September 17, 2024, Waters sent Youth Juice and Welcome to Youth $10,000 via Zelle from his Bank of America account.

68.     On September 17, 2024, Waters sent Scott and Welcome to Youth an additional $2,600 via Zelle from his JPMorgan Chase Bank account.

69.     Despite receiving $12,600 the previous day, Scott sent a text message to Waters on September 18, 2024, stating that she still owed her produce supplier $2,500. Waters stressed the importance of getting the letter of intent executed in order to release additional funding.

70.     On September 19, 2024, Waters sent an email to Scott, Mann, and Cruz stating that the Letter of Intent was being finalized to reflect Plaintiffs $200,000 investment for $30% of Welcome to Youth. Scott responded to Water's email that everything looks good to her and that she was very excited about all these new developments. Scott had been touring commercial spaces with Waters and they were close to executing a new lease in Arlington Heights with a move in date of October 1.

71.     Scott had several expenses that Plaintiffs needed to satisfy, including a truck that required a $5,000 deposit and a security deposit for the lease requiring between $20,000 and $30,000. Scott asked that Plaintiffs ensure that she could either pick up checks from Plaintiffs or they could deposit them into the Welcome to Youth bank account electronically.

72.     On September 23, 2024, Scott texted and emailed Plaintiffs an update regarding the Arlington Heights Lease. Scott requested that Plaintiffs review the lease and requested additional funds in order to pay for the $21,000 security deposit. Scott expressed the need to receive the funds as soon as possible.

73.     That same day, Scott texted Waters that she really needed Cruz and Mann's money. Scott asks Waters to nudge Mann in order for him to send her funds. Scott stated that Cruz agreed to get her $14,000 in checks.

74.     On September 24, 2024, Cruz wrote two checks for a total of $14,000 to Welcome to Youth that were cashed by Scott that day.

75.     On September 24, 2024, Mann wrote a check to Welcome to Youth for $6,873.18.

76.     On September 24, 2024, Scott sends an investor update spreadsheet to Plaintiffs setting forth the total amount each had contributed to Welcome to Youth. Waters tells Scott that he believes the total investment for Cruz is wrong. Her sheet said $32,000 but the numbers added up to approximately $38,000.

77.     On September 25, 2024, Waters sent Scott and Welcome to Youth $3,750 via Zelle from his JPMorgan Chase Bank account.

78.     On September 25, 2024, Waters texted Scott and asked that she send an email to Plaintiffs with sales projections, recent closes, etc. in order to keep the other investors motivated and maximize their confidence to get their additional funds in. Scott deflected by stating how busy she was given her strong sales. Scott again complained to Waters that she needed more money despite her growing customer base.

79.     On September 26, 2024, Cruz wrote a check to Welcome to Youth for $5,250 that was cashed by Scott that day.

80.     On September 26, 2024, Cruz sent Scott an additional $500 via Zelle.

81.     On September 27, 2024, Mann paid $8,750.00 to Friendly Ford for a down payment on a truck to be used for deliveries.

82.     On September 27, 2024, Scott informed Plaintiffs that she had secured the Arlington Heights production facility and intended on moving that weekend. Scott thanked Waters and Mann for their honesty and help in dealing with her previous landlord and the moving process.

83.     In a text message dated October 2, 2024, Scott informs Waters of an issue with the real estate attorney that assisted her with the new property. Scott stated that the attorney was complaining that he had not been paid. Scott told the attorney to contact Mann who would pay the legal fees. The attorney told Scott that this was not Mann's obligation as Scott signed the engagement letter with the attorney.

84.     Scott told the attorney that "I understand that Youth Juice signed the letter of engagement, but I explained David owns a part of Youth Juice so just as much as it's my responsibility, it's David's responsibility." Scott categorizing Mann as a part owner of Youth Juice is contrary to her prior statements that Mann was investing in Welcome to Youth and explicitly not Youth Juice.

85.     On October 5, 2024, Scott again texted Waters and requested additional funds. Waters and Scott discussed the agreement between the parties needed to be finalized so that more funds can be released to Welcome to Youth.

86.     On October 6, 2024, Scott, at the request of Waters, reached out to Wheaton Bank to open a secure line of credit with Waters as an authorized signor. Wheaton Bank responds with a list of forms that needed to be completed including Scott's tax returns, her businesses tax returns,

a personal financial statement from Scott, and Articles of Incorporation. Scott never sent Wheaton Bank nor Waters the requested information.

87.     On October 7, 2024, Waters sent Scott and Welcome to Youth $5,000 via Zelle from his JPMorgan Chase Bank account.

88.     On October 8, 2024, Waters sent Scott and Welcome to Youth $5,000 via Zelle from his JPMorgan Chase Bank account.

89.     On October 10, 2024, Waters sent Scott and Welcome to Youth $3,250 via Zelle from his JPMorgan Chase Bank account.

90.     That same day, Waters requested that Scott share an updated investor spreadsheet given his recent deposits. Waters also corresponds with Mann and Cruz to discuss the line of credit they are pursuing and to releasing their next investments into the Welcome to Youth account.

91.     On October 11, 2024, Cruz wrote a check for $8,000 to Welcome to Youth that was cashed by Scott on October 15, 2024. Cruz specified that the check was an "investment."

92.     On October 14, 2024, Scott emailed to Plaintiffs information pertaining to open client invoices. Scott had failed to collect $4,158.50 from various customers. Waters expressed his concern with the outstanding accounts. Waters stated that some of the invoices were either paid and not journaled appropriately or not paid at all. Scott assured Waters that her books were correct but did not allow Waters to view them for himself.

93.     On October 15, 2024, Scott informed Waters via text message that she applied for a business credit card without Waters as a co-signer. Scott stated that she applied for the credit card under Youth Juice and not Welcome to Youth.

94.     On October 22, 2024, Scott again needed capital, this time for tenant improvements to the new Arlington Heights location. Scott complained to Waters via text message that Cruz had

been behind on getting her money. Scott falsely stated that Cruz had invested $52,250, when his actual investment was $55,750 as of that date.

95.     On October 25, 2024, Cruz wrote a check for $6,000 to Welcome to Youth that was cashed by Scott on October 28, 2024.

96.     On October 26, 2024, Scott informed Waters that she needed $20,000 to pay for a contractor to complete tenant improvements on the Arlington Heights property. Scott stated that she spoke with Mann, who agreed to place all upfront costs for the build out on his credit cards. Scott stated that these costs would be reimbursed by her landlord, but she would deposit those funds in the Youth Juice account instead of repaying Mann.

97.     On October 28, 2024, Mann paid $3,264.79 for equipment.

98.     On October 29, 2024, Scott charged $1,531.10 to Mann's credit card for a juicer.

99.     On November 2, 2024, Cruz sent Scott $3,500 via Zelle.

100.    On November 3, 2024, Waters, at the direction of Scott, sent an email to Scott, Mann, and Cruz highlighting Welcome to Youth's need to raise an additional $25,000 to $30,000. Scott responded that there was a lot of money going out and not a lot coming in. Scott dictated that they had $14,883 overdue receivables and a total owed of $23,953. Scott again expressed her need to secure funding that day and stated that she would coordinate with Plaintiffs to pick up the money.

101.    On November 4, 2024, Cruz wrote a check for $1,916 to Welcome to Youth that was cashed by Scott that day.

102.    On November 5, 2024, Scott complained to Waters via text that she needed cash for staffing and produce. Scott had $24,000 worth of bills to pay with $15,000 past due. Scott again stated she was picking and choosing who to pay based on how late each bill was.

103.    That day, Waters sent Scott and Youth Juice $5,000 via Zelle from his Bank of America account.

104.    On November 5, 2024, Mann paid $1,444.12 to Liberty Mutual Insurance.

105.    On November 6, 2024, Waters sent Scott and Youth Juice $4,666 via Zelle from his JPMorgan Chase Bank account.

106.    On November 6, 2024, Scott charged $355.45 to Mann's credit card for bottles.

107.    On November 8, 2024, Scott charged an additional $480.00 to Mann's credit card for bottles.

108.    On November 11, 2024, Scott corresponded with Waters and stated, after review of her profits and loss numbers, the prior month was the least amount of cash Welcome to Youth had run through and they grew in sales by $6,000. Scott claimed this, despite complaining less than a week prior that she had $24,000 in past due bills.

109.    On November 11, 2024, Mann paid $788.68 to Lake Shore Recycling for trash removal.

110.    On November 12, 2024, Waters sent Scott and Youth Juice $2,000 via Zelle from his JPMorgan Chase Bank account.

111.    On November 12, 2024, Scott charged $4789.04 to Mann's credit card for bottles.

112.    On November 17, 2024, Scott provided an update to Waters via text message. Scott stated that she needed $9,500 for the second half of the tenant improvements project, $4,000 for the architect, and $5,000 for epoxy. Waters stated that he was not comfortable supplying additional capital until the letter of intent is signed. Scott then changes the subject and talks about new sales she has made.

113.    On November 19, 2024, Scott reached out to Waters and stated she needed to raise $55,000 quickly. Scott suggested selling Plaintiffs an additional 3% of Welcome to Youth to Plaintiffs for $55,000. Waters stated they would not agree to that, as it would raise the company's valuation to $1.7 million. Waters explained that a valuation that high would be offensive to any future investors and seem deceptive or fraudulent given the company's expenses and profits. Waters stated he would go through different scenarios in order to help Scott raise the funds and keep the valuation at a more reasonable number.

114.    On November 19, 2024, Scott charged $759.00 to Mann's credit card for AFL Acquisition.

115.    On November 20, 2024, Waters sent a text message to Scott outlining a potential solution to her need to raise additional capital. Waters offered two options: (1) Plaintiffs contribute $275,000 for 35% of the company at a valuation of $785,714.29; and (2) Plaintiffs contribute $250,000 for 33% of the company at a valuation of $757,575.76. Scott stated that she wanted to go with option 1.

116.    On November 20, 2024, Scott charged $1,037.00 to Mann's credit card for AFL Acquisitions.

117.    On November 21, 2024, Scott spoke to Mann on the phone in order to memorialize the parties agreement on equity and total investment. Mann insisted on option 2 as it would save Scott 2%. Scott stated she wanted to put a clause in the agreement "similar to their first deal" where there was an option for Scott to ask for an additional $25,000 for 2% of the company.

118.    That day, Scott asked Waters via text message if Mann or Cruz would send her a check that day because she needed to write checks to pay employees and could not do so. Scott

also stated that she needed to pay an HVAC contractor as well as her label maker, who stopped printing due to Scott's failure to pay.

119.     On November 22, 2024, Scott charged $1,381.21 to Mann's credit card for bottles.

120.     On November 22, 2024, Scott texted Waters that she was waiting on Mann to finalize the parties' agreement. Scott stated that she called Mann and agreed to $250,000 for 33% of the company with an option for an additional $25,000 for 2%. Scott and Mann agreed that 33% would look better from a valuation standpoint if they were to engage other investors.

121.     Scott instructed Mann to draft the Letter of Intent with the company name Welcome to Youth Juice Ltd.

122.     On November 24, 2024, Cruz sent Scott $3,000 via Zelle. In the request for payment, Scott dictated that the reason for requesting the funds was "Finalizing business partnership!"

123.     On November 25, 2024, Waters sent Scott and Youth Juice $3,000 via Zelle from his JPMorgan Chase Bank account.

124.     On November 26, 2024, an attorney sends a draft Letter of Intent to Waters and Mann with the terms agreed upon by Scott on November 22. Mann adds one clause to the agreement, which holds:

> Jessica and the Company represent and warrant that any value associated with the sale and production of the Juice products are owned and operated solely by Welcome to Youth Juice Ltd. and in the event of a breach of this warranty and representation Jessica and the Company will take all necessary steps to insure that Buyers have an interest in 33% of anything of value related to the production and sale of the juice and related products.

125.     On November 27, 2024, the Letter of Intent is out for signature via DocuSign. Waters sent a text message to Scott to check her inbox and that her signature was the last remaining. Scott responded that she received the DocuSign and would review that weekend.

126.    On November 27, 2024, Mann paid Scott $9,500 in order to pay a contractor for tenant improvements made to the Arlington Heights location.

127.    On November 27, 2024, Mann also paid Scott $1,081.47 to pay for Scott's accountant as well as additional bottles.

128.    On November 29, 2024, Waters sends a text message to Scott asking if she had time to review the document and sign. Waters stated that Plaintiffs will move cash into her account after signature is confirmed. Scott responds that with it being thanksgiving, she did not have a chance to review it yet.

129.    On December 2, 2024, Waters again messages Scott and asks whether she has signed the agreement. Scott responds that she has an attorney that she has been waiting on to review the document. The attorney has been out of town due to thanksgiving holiday. Scott was to let Plaintiffs know when the attorney was done with their review. Waters asks Scott how cash flow is at the company. Scott responds that she is hanging in there.

130.    On December 4, 2024, Scott informed Plaintiffs that, after discussing with her attorneys she would not sign the document. Scott stated this was based off the language used in the newest document and that she was not certain the future of her company was best suited for the partnership. The only change to the document was Mann's inclusion of the warranty that "any value associated with the sale and production of the Juice products are owned and operated solely by" Scott.

131.    On December 5, 2024, Scott stated that "given the fact that the terms have consistency changed since the initial conversations and the second LOI is not in line with the initial discussions. Coupled with contacts and a contract that were given. Those Avenues have now been closed, prior to me responding to you. I recognize this is not a partnership that is well suited for

myself or the company. In the interim, the reason for my delayed response is due to raising funds among family and friends to ensure a timely fashion to get you some funds."

132.     After receiving the funds and the documents related to the Agreement, Scott went silent and refused to have further communication with the Plaintiffs.

133.     In total, Cruz was defrauded of $70,166 by Scott and Welcome to Youth.

134.     In total, Mann was defrauded of $69,467.03 by Scott and Welcome to Youth.

135.     In total, Waters was defrauded of $72,036.77 by Scott and Welcome to Youth.

136.     Between June 2024 and November 2024, Scott and Welcome to Youth fraudulently obtained $211,669.80 from Plaintiffs. Scott has since ceased all communication with Plaintiffs.

## COUNT I
## VIOLATION OF 18 U.S.C. § 1962(C)

137.     Plaintiffs reallege paragraphs 1 through 134 as though fully set forth herein.

138.     The Racketeer Influenced and Corrupt Organizations Act ("RICO") makes it unlawful "for any person through a pattern of racketeering activity ... to acquire or maintain, directly or indirectly, any interest in or control of any enterprise which is engaged in, or the activities of which affected, interstate or foreign commerce." 18 U.S.C. § 1962(c).

139.     Each Defendant is a "person" within the meaning of 18 U.S.C. § 1961(3) who conducted or participated, directly or indirectly, in the affairs of the enterprise through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c).

140.     The RICO enterprise is an association in fact enterprise, within the meaning of 18 U.S.C. § 1961(4) which includes Jessica Scott, Welcome to Youth, and Youth Juice. Their association encompassed an enterprise for the commission of at least two predicate acts of racketeering activity enumerated in 18 U.S.C. § 1961(1)(B) (the "Enterprise").

141.    The Defendants agreed to and did conduct and participate in the conduct of the Enterprise's affairs through a pattern of racketeering activity and for the unlawful purpose of intentionally defrauding Plaintiffs. Specifically, Scott conducted the Enterprises affairs by soliciting "investments" from Plaintiffs and others via thousands of text messages, phone calls, and emails. Once a group of investors were at the stage of reaching an agreement with the Enterprise, Scott would then operate the Enterprise under a new name and begin finding new victims to her scheme.

142.    Pursuant to and in furtherance of their fraudulent scheme, Defendants committed multiple related acts of wire fraud in violation of 18 U.S.C. § 1343.

143.    These numerous acts of wire fraud set forth above constitute a pattern of racketeering activity pursuant to 18 U.S.C. § 1961(5).

144.    At all relevant times, each Defendant was associated with the Enterprise, and exerted control over the Enterprise and/or participated directly or indirectly in the operation and management of the affairs of the Enterprise.

145.    The Enterprise engaged in and affected interstate commerce through the use of wires to communicate through computers, telephone, e-mail and to fraudulently obtain money from Plaintiffs and to transfer assets and funds between persons in the Enterprise.

146.    As a direct and proximate result of the Defendants' numerous acts of wire fraud in violation of 18 U.S.C. § 1962(c), Plaintiffs have been injured in their business and property in an amount greater than $211,669.80.

147.    Pursuant to 18 U.S.C. § 1964(c), plaintiffs are entitled to recover threefold their damages plus costs and attorney's fees.

WHEREFORE, Plaintiffs, Miguel Cruz, David Mann, and Jeff Waters respectfully requests that this Court enter judgment in its favor and against Defendants Scott, Youth Juice, and Welcome to Youth, and enter an order:

a.      Awarding Plaintiffs damages in an amount in excess of $211,669.80;

b.      Awarding the Plaintiffs three times the amount of actual damages incurred as a result of the Defendants' conduct pursuant to 18 U.S.C. § 1964(c);

c.      Awarding the Plaintiffs costs of litigation including but not limited to, attorneys' fees, court costs and expert costs; and

d.      For such other and further relief as this Court deems proper.

## THE PENDENT STATE LAW CLAIMS
## COUNT II
## COMMON LAW FRAUD

148.    Plaintiffs reallege paragraphs 1 through 147 as though fully set forth herein.

149.    Scott received $211,669.80 from Plaintiffs in funds intended for use as operating capital and to expand the business of Welcome to Youth.

150.    Scott did so by represented to Plaintiffs that their investment in Welcome to Youth was in exchange for a 33% stake in Welcome to Youth.

151.    The representation was known to be fraudulent when it was made.

152.    After receiving the funding from Plaintiffs, Scott failed to acknowledge Plaintiffs equity in Welcome to Youth and further ceased all contact with Plaintiffs.

153.    At the time that Scott made the representations to Plaintiffs, she knew that her representations were false and that she needed Plaintiffs' capital investment to support Welcome to Youth.

154.    Scott made the representations to Plaintiffs with the intent to fraudulently obtain their money so she could use Plaintiffs' funds without Plaintiffs involvement.

155.    Plaintiffs were reasonable induced by Scott's representations to invest funds into Welcome to Youth and did so.

156.    Through Scott's fraud, Plaintiffs have incurred damages in excess of $211,669.80.

WHEREFORE, Plaintiffs, Miguel Cruz, David Mann, and Jeff Waters respectfully requests that this Court enter judgment in its favor and against Defendants Scott, Youth Juice, and Welcome to Youth, and issue an order:

a.      Finding that the foregoing acts by Defendants constitute common law fraud;

b.      Awarding Plaintiffs compensatory and consequential damages resulting from the acts complained of in this Count I, in amounts to be proven at trial, but which is no less than $211,669.80;

c.      Award punitive damages for Defendants' willfully fraudulent acts in an amount to be proven at trial;

d.      Awarding Plaintiffs pre-judgment and post-judgment interest on all monetary amounts awarded in this action; and

e.      Awarding such other general and equitable relief as this Court deems proper and just.

**COUNT III**
**CONVERSION/THEFT**

157.    Plaintiffs reallege paragraphs 1 through 156 as though fully set forth herein.

158.    Scott received at least $211,669.80 in funds for use as investment capital in her businesses Youth Juice and Welcome to Youth. Scott had no legal right to take or use the funds Plaintiffs had invested.

159.    As stated above, the investment capital was issued to Scott in exchange for equity in Welcome to Youth. After receiving the funds, Scott failed to acknowledge Plaintiffs' equity while simultaneously keeping the funds for herself and her businesses.

160.    Defendants' retention of the funds without providing any consideration for the funds constitutes conversion. None of the funds converted have been repaid to Plaintiffs.

161.    Defendants continue to possess, control, or have wrongfully benefitted from their conversion of Plaintiffs' funds.

162.    Despite Plaintiffs' repeated demands for payment, Defendants have refused and continue to refuse to return the funds stolen from Plaintiffs.

163.    Those funds, which were located in bank accounts in each of the Plaintiffs' names, belong to Plaintiffs. Each has an immediate right to and have been unlawfully deprived of those funds.

WHEREFORE, Plaintiffs, Miguel Cruz, David Mann, and Jeff Waters respectfully requests that this Court enter judgment in its favor and against Defendants Scott, Youth Juice, and Welcome to Youth, and issue an order:

a.    Finding that the foregoing acts by Defendants constitute conversion;

b.    Awarding Plaintiffs damages caused by Defendants conversion;

c.    Awarding Plaintiffs attorneys' fees and costs for bringing this action; and

d.    Awarding such other general and equitable relief as this Court deems proper and just.

DATED: March 20, 2025                              Respectfully Submitted,

Lawrence W. Byrne
PEDERSEN & HOUPT
161 North Clark Street, Suite 2700
Chicago, Illinois 60601
Phone: (312) 261-6888
lbyrne@pedersenhoupt.com
*Attorney for Plaintiffs*